UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------X
STOKER OLUKOTUN WILLIAMS,

                    Plaintiff,

                                              MEMORANDUM & ORDER
         -against-                            14-CV-5742(JS)(ARL)

DR. VINCENT GERACI, CHARLES EWALD,
DEPUTY ALLEN SHAPIRO, MARION WEBSTER,
OFFICER ROBERT "BOB" KOCH, SUFFOLK
COUNTY, and DEPUTY DOUGLAS MEHRMAN,

                    Defendants.
---------------------------------------X
APPEARANCES
For Plaintiff:          Stoker Olukotun Williams, pro se
                        Inmate No. 16A5064
                        Shawangunk Correctional Facility
                        P.O. Box 700
                        Wallkill, NY 12589

For Defendants:         Brian C. Mitchell, Esq.
                        Suffolk County Attorney
                        100 Veteran's Memorial Highway
                        P.O. Box 6100
                        Hauppauge, NY 11788


SEYBERT, District Judge:

        Currently pending before the Court is defendants Dr.

Vincent Geraci ("Dr. Geraci"), Warden Charles Ewald ("Warden

Ewald"), Deputy Allen Shapiro ("Deputy Shapiro"), Marion Webster

("Nurse Webster"), Officer Robert "Bob" Koch ("Officer Koch"),

Suffolk County (the "County"), and Deputy Douglas Mehrman's

("Deputy Mehrman") (collectively, "Defendants") motion for summary

judgment.  (Defs.' Mot., Docket Entry 127.)  For the following

reasons, Defendants' Motion is GRANTED IN PART and DENIED IN PART.

I.    Factual Background[1]

On September 8, 2013, Plaintiff was admitted to the Suffolk County Correctional Facility ("SCCF").  (Defs.' 56.1 Stmt., Docket Entry 112-1, ¶ 1.)  Defendants allege that Plaintiff was periodically treated for a gunshot wound and a hand injury during 2013 and did not complain about back pain.  (Defs.' 56.1 Stmt. ¶¶ 1-2.)  Plaintiff alleges that he handed in at least two medical "chits" per week from mid-September 2013 through mid-February 2014, and he filed his first medical grievance on February 23, 2014.  (Pl.'s 56.1 Counterstmt., Docket Entry 112-2, ¶ 3.)  Plaintiff alleges that his medical chits were ignored.  (Pl.'s 56.1 Counterstmt. ¶ 4.)  However, it is undisputed that between September 2013 and June 2014, Plaintiff played basketball two to

_____

[1] The following facts are drawn from Defendants' Local Rule 56.1 Statement and Supplemental Rule 56.1 Statement, as well as Plaintiff's Local Rule 56.1 Counterstatement.  Additionally, facts are drawn from Plaintiffs' "Response," which the Court construes as a Supplemental Rule 56.1 Counterstatement, as it appears to correspond with the numbered paragraphs in Defendants' Supplemental Rule 56.1 Statement.  (See Pl.'s Suppl. 56.1 Counterstmt., Docket Entry 131.)  The Court notes that Defendants did not request leave to file a Supplemental Rule 56.1 Statement.  However, in light of Plaintiff's amendment of the Amended Complaint after the exchange of Rule 56.1 Statements, (see Sec. Am. Compl., Docket Entry 123), the parties are granted leave to file supplemental Rule 56.1 Statements nunc pro tunc.  Any factual disputes are noted.  All internal quotation marks and citations have been omitted.

three times per week and was able to dunk the basketball. (Defs.' 56.1 Stmt. ¶¶ 5-6.)

Defendants allege that the first time Plaintiff complained of back pain was on February 26, 2014, when he was seen at the Jail Medical Unit and reported a discharge from his nipple and lower back pain. (Defs.' 56.1 Stmt. ¶ 3.) Defendant alleges that Plaintiff's history regarding prior back pain was "inconsistent," he did not have any "outward manifestations [of] any pain or diminished range of motion," and he was prescribed ibuprofen and given physical therapy exercises to build neck and back strength. (Defs.' 56.1 Stmt. ¶ 3.)

Plaintiff alleges that on April 2, 2014, he had a "writ of habeas corpus hearing" in which he sought an MRI and orthopedic evaluation. (Pl.'s 56.1 Counterstmt. ¶ 4.) On April 3, 2014, Plaintiff was examined at the Jail Medical Unit. (Defs.' 56.1 Stmt. ¶ 4.) Defendants allege that Plaintiff was "observed to be in no apparent distress," was prescribed Naprosyn because he alleged that his prior medication was not working. (Defs.' 56.1 Stmt. ¶ 4.) Plaintiff was also advised to use sports cream, take hot showers, and continue lower back exercises. (Defs.' 56.1 Stmt. ¶ 4.)

On June 18, 2014, Plaintiff was examined at the Jail Medical Unit after he complained that he was injured while trying to dunk a basketball. (Defs.' 56.1 Stmt. ¶ 7.) Plaintiff alleges

that he fell and could not stand or straighten his back. (Pl.'s 56.1 Counterstmt. ¶ 7.) Defendants allege that while Plaintiff did not demonstrate "apparent distress," he was taken to Peconic Bay Hospital for follow up treatment. (Defs.' 56.1 Stmt. ¶ 8.) Plaintiff avers that medical notes documented that he was not able to rise without assistance and displayed high blood pressure. (Pl.'s 56.1 Counterstmt. ¶ 8.) Defendants allege that on June 19, 2014, a corrections officer advised a nurse that Plaintiff "was able to ambulate without any difficulty and no physical impairments were noted." (Defs.' 56.1 Stmt. ¶ 9.) Plaintiff alleges that on that date he was "walking hunched over." (Pl.'s 56.1 Counterstmt. ¶ 9.)

On June 20, 2014, Dr. Geraci saw Plaintiff and prescribed a muscle relaxant but determined that a wheelchair was not necessary and instead prescribed a walker. (Defs.' 56.1 Stmt. ¶ 10.) Plaintiff alleges that Dr. Geraci stated that he would not order an MRI because it was too expensive and told Plaintiff to "man up" when he complained that the walker hurt his back. (Pl.'s 56.1 Counterstmt. ¶ 10.) However, Defendants allege that cost was not a factor in determining Plaintiff's medical treatment. (Defs.' 56.1 Stmt. ¶ 28.) Defendants allege that observation reports indicate that on June 24, 2014, Plaintiff was able to stand and walk without mobility issues. (Defs.' 56.1 Stmt. ¶ 11.) Plaintiff alleges that records indicate he was "hunched over using a walker"

4

and used a walker and shower chair. (Pl.'s 56.1 Counterstmt. ¶ 11.)

Progress notes dated July 13, 2014, indicate that Plaintiff did not display any mobility issues and was observed going to the yard without his walker. (Defs.' 56.1 Stmt. ¶ 12.) Plaintiff does not dispute that allegation and avers that he "felt better." (Pl.'s 56.1 Counterstmt. ¶ 12.) Plaintiff only used the walker to travel to the medical unit and on July 13, 2014, his walker was discontinued. (Defs.' 56.1 Stmt. ¶ 13.) Plaintiff concedes that he advised that he no longer needed the walker. (Pl.'s 56.1 Counterstmt. ¶ 13.) Defendants allege that observation reports were reviewed by the medical unit on four occasions between November 14, 2014, and January 16, 2015, and "[o]n each occasion the reports indicated that the [P]laintiff displayed no signs of abnormal mobility issues." (Defs.' 56.1 Stmt. ¶ 14.) Plaintiff alleges that he has spent twenty-three hours per day in his cell since September 8, 2013, and typically walks three steps to a chair or five steps to a shower. (Pl.'s 56.1 Counterstmt. ¶ 14.)

On February 11, 2015, Plaintiff went to the medical unit and complained that he was unable to walk through the tunnel to court. (Defs.' 56.1 Stmt. ¶ 15.) However, Defendants allege that medical unit personnel observed Plaintiff walking in the hall corridor without assistance. (Defs.' 56.1 Stmt. ¶ 15.) Plaintiff alleges that he told Nurse Webster that he had spinal stenosis,

sciatica, and herniated discs, but she did not permit him to use a wheelchair. (Pl.'s 56.1 Counterstmt. ¶ 15.) The parties do not dispute that Plaintiff was prescribed Amitriptyline; however, it is disputed whether that medication is a muscle relaxant. (Defs.' 56.1 Stmt. ¶ 15; Pl.'s 56.1 Counterstmt. ¶ 15.)

Defendants allege that Plaintiff remained on the medical tier after he was seen on February 11, 2015, and observation reports indicate that he did not display mobility problems. (Defs.' 56.1 Stmt. ¶ 16.) Plaintiff alleges that he was not on the medical tier, as he was precluded from certain housing areas for security reasons. (Pl.'s 56.1 Counterstmt. ¶ 16.) Observation reports for April 17, 2015, indicate that Plaintiff advised a corrections officer that he "felt fine" and he was able to "ambulate without difficulty." (Defs.' 56.1 Stmt. ¶ 17.)

On May 27, 2015, Plaintiff refused to attend a physical examination in connection with his criminal case and alleged that he needed a wheelchair. (Defs.' 56.1 Stmt. ¶ 18.) Defendants allege that Dr. Geraci examined Plaintiff and determined that he did not need a wheelchair. (Defs.' 56.1 Stmt. ¶ 18.) Plaintiff alleges that he had not seen Dr. Geraci since June 20, 2014. (Pl.'s 56.1 Counterstmt. ¶ 18.) However, pursuant to a request from the District Attorney's Office and the court, Dr. Geraci approved a wheelchair for Plaintiff to use on that single occasion "to facilitate the interview." (Defs.' 56.1 Stmt. ¶ 18.)

Defendants allege that observation reports reviewed by the medical unit on June 23, 2015, indicated that Plaintiff did not have any difficulty ambulating. (Defs.' 56.1 Stmt. ¶ 19.)

Plaintiff was seen by members of SCCF's Mental Health Unit on five occasions between July 7, 2015, and October 20, 2015, and he did not complain about back pain. (Defs.' Suppl. 56.1 Stmt., Docket Entry 127-3, ¶ 42.) Plaintiff alleges that he asked "Jane and Joe" if they could order an MRI but was told "that is up to Dr. Geraci." (Pl.'s Suppl. 56.1 Counterstmt. ¶ 42.) Defendants allege that on August 28, 2015, Plaintiff filed a written complaint with the medical unit with respect to "alleged maltreatment by officers," but did not complain about his back or any pain. (Defs.' 56.1 Stmt. ¶ 44.) Plaintiff alleges that he complained about a lack of treatment. (Pl.'s Suppl. 56.1 Counterstmt. ¶ 44.) Defendants allege that on November 6, 2015, and November 7, 2015, Plaintiff received a blood pressure check at the medical unit but did not complain about his back or indicate that he was in pain. (Defs.' Suppl. 56.1 Stmt. ¶ 46.) Defendants allege that Plaintiff was seen by the SCCF Mental Health Unit on four occasions between November 16, 2015, and March 29, 2016, and did not complain about his back or indicate that he was in pain. (Defs.' Suppl. 56.1 Stmt. ¶ 48.) Plaintiff alleges that he asked the mental health staff for an MRI and pain medication and they stated that Dr.

Geraci was responsible for those determinations. (Pl.'s Suppl. 56.1 Counterstmt. ¶ 48.)

On April 22, 2016, Dr. Geraci met with Plaintiff to discuss a grievance in which he alleged that he was denied an MRI based on cost. (Defs.' Suppl. 56.1 Stmt. ¶¶ 49, 52.) Defendants allege that Plaintiff appeared to be in "good spirits" and "was not in any distress." (Defs.' Suppl. 56.1 Stmt. ¶ 52.) Defendants allege that Plaintiff advised Dr. Geraci of his family history of spinal stenosis and opined that he may have spinal stenosis; however, Plaintiff also indicated that he continued to play basketball and walk to the law library. (Defs.' 56.1 Suppl. Stmt. ¶¶ 53-54.) Plaintiff appears to dispute that allegation by alleging that he has not played basketball since June 2014 and "the Law Library is less than 60 seconds away." (Pl.'s Suppl. 56.1 Counterstmt. ¶ 54.) Plaintiff complained of periodic "severe" lower back pain with spasms and stated that he continued to take Amitriptyline and Zyprexa, which helped him. (Defs.' Suppl. 56.1 Stmt. ¶¶ 56, 58.) Although Dr. Geraci felt Plaintiff's complaints did not correspond with his physical abilities, he prescribed Robaxin for muscle spasms, Tylenol as needed for back pain, and requested an MRI of the lower spine to rule out stenosis. (Defs.' Suppl. 56.1 Stmt. ¶ 59.) Plaintiff alleges that he requested an MRI of his entire spine but Dr. Geraci indicated that he would order an MRI of the lumbar spine and request an MRI for the

remainder of his spine at a later date.  (Pl.'s Suppl. 56.1
Counterstmt. ¶ 60.)

Plaintiff received an MRI of the lower back in May 2016,
which ruled out stenosis.   (Defs.' Suppl. 56.1 Stmt. ¶ 62.)
Plaintiff alleges that stenosis in his lumbar spine was ruled out
but it is unclear if he suffers from stenosis in his thoratic or
cervical spine.  (Pl.'s Suppl. 56.1 Counterstmt. ¶ 62.)  Dr. Geraci
discussed the MRI results with Plaintiff and Plaintiff insisted he
receive a full MRI of his entire spine.  (Defs.' Suppl. 56.1 Stmt.
¶ 63.)   Dr. Geraci declined, as a full MRI "was not medically
indicated."  (Defs.' Suppl. 56.1 Stmt. ¶ 63.)   Plaintiff alleges
that Dr. Geraci said he would order an MRI of the entire spine and
approve spinal surgery.  (Pl.'s 56.1 Suppl. Counterstmt. ¶ 63.)
Dr. Geraci scheduled a follow-up appointment with a neurosurgeon
to determine if Plaintiff needed surgery.  (Defs.' Suppl. 56.1
Stmt. ¶ 64.)  Plaintiff was seen at Peconic Bay Medical Center on
July 20, 2016, where "it was recommended that the proper course of
care would be conservative therapy including physical therapy as
an appropriate modality of care." (Defs.' Suppl. 56.1 Stmt. ¶ 64.)

A.  Plaintiff's Grievances

On March 22, 2015, Plaintiff filed a grievance regarding
a disciplinary infraction and included a claim that he had been
denied medical care and a wheelchair.  (Defs.' 56.1 Stmt. ¶ 29.)
Plaintiff's grievance was returned to him with an indication that

"the grievance concerned the disposition, surcharge or sanctions of a disciplinary hearing and accordingly was not a grievable issue." (Defs.' 56.1 Stmt. ¶ 30.) Plaintiff did not appeal the determination of this grievance and alleges that "[i]t was not possible to appeal it." (Defs.' 56.1 Stmt. ¶ 32; Pl.'s 56.1 Counterstmt. ¶ 32.) The parties dispute whether Plaintiff filed a grievance "relating specifically" to Dr. Geraci's conduct. (Defs.' 56.1 Stmt. ¶ 33; Pl.'s 56.1 Counterstmt. ¶ 33.) Defendants allege that even if Plaintiff filed a grievance that specifically addressed Dr. Geraci's conduct, he did not file an appeal. (Defs.' 56.1 Stmt. ¶ 34.) Plaintiff alleges the determination "was not an appealable issue." (Pl.'s 56.1 Counterstmt. ¶ 34.)

On August 17, 2015, Plaintiff filed a grievance against Officer Koch. (Defs.' 56.1 Stmt. ¶ 35.) Plaintiff alleges that he previously filed multiple grievances against Officer Koch that were accepted and then "lost." (Pl.'s 56.1 Counterstmt. ¶ 35.) Plaintiff's August 17, 2015, grievance was returned based on untimeliness. (Defs.' 56.1 Stmt. ¶ 36.) Plaintiff did not appeal that determination. (Defs.' 56.1 Stmt. ¶ 37.)

On January 14, 2016, Plaintiff completed a grievance alleging that he was denied an MRI based on cost. In February 2016, Plaintiff's grievance grievance was forwarded to the SCCF medical unit. (Defs.' Suppl. 56.1 Stmt. ¶ 49.) Defendants allege that Plaintiff did not file grievances regarding conduct by Nurse

Webster or Warden Ewald. (Defs.' 56.1 Stmt. ¶ 38.) Plaintiff alleges that he filed a medical grievance that was returned to him on February 11, 2015. (Pl.'s 56.1 Counterstmt. ¶ 38.) The parties also dispute whether Plaintiff filed a grievance regarding "any policy procedure or custom of the County of Suffolk that was the cause of violation of his constitutional rights." (Defs.' 56.1 Stmt. ¶ 40.)

B. Warden Ewald

Defendants allege that Warden Ewald does not supervise Dr. Geraci and "has never been personally involved in the medical care or treatment of [Plaintiff]." (Defs.' Suppl. 56.1 Stmt. ¶ 70.) Plaintiff alleges that he is in Warden Ewald's "custody" and he "sent [Warden Ewald] a certified letter requesting that he step[ ] in." (Pl.'s Suppl. 56.1 Counterstmt. ¶ 68.)

C. Deputy Sheriffs Shapiro and Mehrman

On June 18, 2014, Deputy Sheriffs Shapiro and Mehrman transported Plaintiff from SCCF to Peconic Bay Hospital in Riverhead, an approximately five to ten minute ride. (Defs.' Suppl. 56.1 Stmt. ¶¶ 71-72.) Defendants allege that Deputy Sheriffs Shapiro and Mehrman did not advise medical personnel at Peconic Bay Hospital how to treat Plaintiff, nor did they suggest that hospital personnel withhold treatment. (Defs.' Suppl. 56.1 Stmt. ¶¶ 73-74.) However, Plaintiff alleges that Deputy Sheriffs Shapiro and Mehrman told him that he did not "deserve to see a

specialist and they are not waiting for [him] to see the orthopedist," and had guns, screamed at him, and intimidated him. (Pl.'s Suppl. 56.1 Counterstmt. ¶¶ 73-74, 16.) Defendants allege that Deputy Sheriffs Shapiro and Mehrman did not force Plaintiff to leave prior to receiving treatment. (Defs.' Suppl. 56.1 Stmt. ¶¶ 75-76.)

II.    The Instant Action

On September 26, 2014, Plaintiff commenced this action asserting claims for deliberate indifference to medical needs pursuant to 42 U.S.C. Section 1983 ("Section 1983"). On April 16, 2015, Plaintiff filed a motion to amend the Complaint. (Docket Entry 23.) On May 11, 2015, Magistrate Judge Arlene R. Lindsay granted Plaintiff's unopposed motion (see May 11, 2015 Electronic Order) and Plaintiff subsequently filed his Amended Complaint on the docket (See Am. Compl., Docket Entry 44). Plaintiff's Amended Complaint added, inter alia, a claim against Officer Koch for intentional infliction of emotional distress and a state law medical negligence claim. (Am. Compl. at 8, 32.) Particularly, the Amended Complaint alleges that Officer Koch told Plaintiff he wanted to "execute [him] with his pistol," wrote down addresses of his visitors, refused to contact the medical staff when Plaintiff was having chest pains, and told Plaintiff "I don't care if you die." (Am. Compl. at 24.)

On September 16, 2015, Plaintiff filed a motion for leave to amend his Amended Complaint. (Docket Entry 60.) On May 5, 2016, Judge Lindsay granted in part and denied in part Plaintiff's motion to amend. (May 6, 2016 Order, Docket Entry 114.) Judge Lindsay granted Plaintiff's motion to the extent he sought to add Shapiro and Mehrman as defendants and add Nurse Webster to the caption in place of "Jane Doe Nurse." (May 2016 Order at 1 n.1; 4.) Judge Lindsay denied Plaintiff's request to add an Assistant County Attorney as a defendant as well as his request to assert a claim for "medical negligence." (Order at 4-7.) On June 28, 2016, Plaintiff filed his Second Amended Complaint (the "Second Amended Complaint").[2] (Sec. Am. Compl., Docket Entry 123.)[3]

III. Defendants' Motion

On August 26, 2016, Defendants filed their motion for summary judgment. (Defs.' Mot., Docket Entry 127.) Defendants argue that Plaintiff cannot establish that he received inadequate medical care or that SCCF medical personnel "act[ed] with the requisite culpable state of mind[.]" (Defs.' Br., Docket Entry

---

[2] On June 29, 2016, Defendants filed a partial motion to dismiss the Second Amended Complaint with respect to Plaintiff's inclusion of claims against additional defendants. (See Docket Entry 122.) On January 10, 2017, this Court granted Defendants' motion. (See Docket Entry 142.)

[3] The Court will utilize the Electronic Case Filing pagination when citing to the Second Amended Complaint.

127-5, at 9.)  Alternatively, Defendants argue that they are
entitled to qualified immunity.  (Defs.' Br. at 19-20.)

Additionally, Defendants aver that Plaintiff's claim
that Deputy Sheriffs Shapiro and Mehrman were abusive and prevented
him from seeing a specialist at Peconic Bay Hospital is undercut
by record evidence indicating that Plaintiff was at the hospital
for over five hours, and was fully examined and prescribed a pain
reliever.  (Defs.' Br. at 15.)  Defendants argue that the record
does not support Plaintiff's allegation that Officer Koch refused
to send him to the medical unit when he was experiencing chest
pains on June 25, 2014; Officer Koch's alleged verbal abuse is not
an actionable constitutional violation; and Plaintiff failed to
exhaust his administrative remedies regarding Officer Koch's
alleged conduct.  (Defs.' Br. at 16-19.)  Defendants allege that
Plaintiff's claims against Warden Ewald should be dismissed based
on his lack of personal involvement in Plaintiff's medical
treatment.  (Defs.' Br. at 20-22.)  Finally, Defendants argue that
Plaintiff has failed to establish that a policy or custom caused
Defendants' alleged constitutional violations such as to warrant
the imposition of municipal liability.  (Defs.' Br. at 22-23.)
As addressed above, the Court construes Plaintiff's "response" to
Defendants' motion, as a Supplemental Rule 56.1 Counterstatement.
(See Docket Entry 131.)  Plaintiff has also proffered a memorandum
detailing a list of cases he argues demonstrate that his "spinal

condition is serious" and "Dr. Geraci met the standard for deliberate indifference," (Pl.'s Br., Docket Entry 131-1), as well as an exhibit list and exhibits, (see Docket Entries 131-2, 131-4, 131-5).

## DISCUSSION

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at *4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation

omitted).  Conclusory allegations or denials will not defeat summary judgment.  Id.  However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"  Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

On a motion for summary judgment, the Court must liberally construe a pro se litigant's complaint and "read a pro se litigant's supporting papers liberally, interpreting them to raise the strongest arguments that they suggest."  Adeyi v. U.S., No. 06-CV-3842, 2010 WL 520544, at *3 (E.D.N.Y. Feb. 8, 2010) (internal quotation marks and citation omitted).  Nevertheless, a litigant's pro se status does not excuse him from the general requirements of summary judgment and "bald assertion[s] unsupported by evidence" will not suffice to overcome summary judgment.  Id. (internal quotation marks and citation omitted).

I.   Federal Claims

"The Eighth Amendment protects incarcerated prisoners from cruel and unusual punishment, while the Due Process Clause of the Fourteenth Amendment protects pretrial detainees from inadequate medical care by the state."  Flemming v. City of N.Y., No. 03-CV-0662, 2006 WL 2853872, at *2 n.2 (E.D.N.Y. Sept. 29,

2006). Nevertheless, the Court utilizes the same standard when analyzing deliberate indifferent claims under the Eighth and Fourteenth Amendments. Id. To establish deliberate indifference to medical needs, the plaintiff must demonstrate the following subjective and objective components: (1) "the alleged deprivation must be, in objective terms, sufficiently serious," and (2) "the defendant must act with a sufficiently culpable state of mind." Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citations omitted).

   With respect to the objective prong, the Court examines: "(1) whether the prisoner was actually deprived of adequate medical care, and (2) whether the inadequacy in medical care is sufficiently serious." Cruz v. Corizon Health Inc., No. 13-CV-2563, 2016 WL 4535040, at *5 (S.D.N.Y. Aug. 29, 2016) (internal quotation marks and citations omitted). The Second Circuit has held that "a serious medical need exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain." Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir. 2003) (internal quotation marks and citations omitted). Additionally, the Court considers factors including: "(1) whether a reasonable doctor or patient would perceive the medical need in question as important and worthy of comment or treatment, (2) whether the medical condition significantly affects daily activities, and (3) the existence of

chronic and substantial pain." Goodwin v. Kennedy, No. 13-CV-1774, 2015 WL 1040663, at *11 (E.D.N.Y. Mar. 10, 2015) (internal quotation marks and citations omitted).

Where the alleged inadequacy relates to the medical treatment provided, the Court employs a narrower inquiry into the seriousness of the plaintiff's deprivation and "'[if] the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.'" Cruz, 2016 WL 4535040, at *4 (quoting Goris v. Breslin, 402 F. App'x 582, 584-85 (2d Cir. 2010)). However, it is well-settled that "'mere disagreement'" regarding the appropriate treatment does not form the basis for a constitutional claim, and "'[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.'" Funderburke v. Canfield, No. 13-CV-6128, 2016 WL 831974, at *7 (W.D.N.Y. Feb. 29, 2016) (quoting Chance, 143 F.3d at 704).

With respect to the subjective prong, "a plaintiff must allege that the defendant knew of and disregarded an excessive risk to [the detainee's] health or safety and that [the defendant] was both aware of the facts from which the inference could be drawn that a substantial risk of harm existed, and also drew the

inference." Black v. Petitinato, No. 16-CV-3941, 2016 WL 3983590, at *3 (E.D.N.Y. Jul. 25, 2016) (internal quotation marks and citations omitted; alterations in original). While "[m]ere negligence" does not support an Eighth Amendment claim, where "prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition 'as punishment or for other invalid reasons,' [ ] such conduct is actionable as deliberate indifference." Rodriguez v. Smith, No. 10-CV-0734, 2011 WL 4479689, at *7 (N.D.N.Y. Aug. 19, 2011), report and recommendation adopted, 2011 WL 4424357 (N.D.N.Y. Sept. 21, 2011), (quoting Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000)).

Preliminarily, to the extent the Second Amended Complaint can be construed as asserting a claim for deliberate indifference based on Defendants' failure to respond to Plaintiff's medical "chits" regarding back and neck pain between September 2013 and February 23, 2014, (see Sec. Am. Compl. at 11), that claim fails. The Court is mindful that "severe back pain may qualify as a serious medical need." Flemming v. City of N.Y., No. 03-CV-0662, 2009 WL 3174060, at *8 (E.D.N.Y. Sept. 30, 2009) ("Flemming II") (internal quotation marks and citation omitted). However, putting aside Plaintiff's failure to indicate which particular defendants or other SCCF employees allegedly ignored his medical requests, the notion that Plaintiff suffered an objectively serious medical deprivation is belied by the

undisputed fact that he played basketball two to three times per week between September 2013 and June 2014, and was able to dunk the basketball. (Defs.' 56.1 Stmt. ¶¶ 5-6; Pl.'s 56.1 Counterstmt. ¶¶ 5-6.)

A.  Dr. Geraci

The Court liberally construes the Second Amended Complaint to assert that Dr. Geraci was deliberately indifferent to Plaintiff's medical needs by: (1) failing to request an MRI after Plaintiff injured his back in June 2014, (Sec. Am. Compl. at 18-19); (2) ignoring medical "chits" between June 20, 2014, and April 22, 2016, (Sec. Am. Compl. at 20-21, 29); (3) refusing to request an MRI of Plaintiff's entire spine in April 2016, (Sec. Am. Compl. at 30).

The Court finds that Plaintiff was not deprived of adequate medical care based on Dr. Geraci's failure to request an MRI in 2014 and failure to request an MRI of Plaintiff's entire spine in 2016. "Whether an MRI should have been done is a classic example of a matter for medical judgment as to the appropriate course of treatment and is not actionable under the Eighth Amendment." Flemming II, 2009 WL 3174060, at *3 (internal quotation marks and citation omitted; alteration in original). See also Wright v. Genovese, 694 F. Supp. 2d 137, 155 (N.D.N.Y. 2010), aff'd, 415 F. App'x 313 (2d Cir. 2011) ("[d]isagreements over medications, diagnostic techniques, forms of treatment, the

need for specialists, and the timing of their intervention implicate medical judgments, not the Eighth Amendment"). When Plaintiff was injured playing basketball on June 18, 2014, he received an x-ray of his back at Peconic Bay Hospital and was administered Percocet and Toradol.[4] (Defs.' Ex. A, Docket Entry 127-6, at 64.) Dr. Geraci examined Plaintiff two days later on June 20, 2014, and prescribed Robaxin, a muscle relaxer. (Defs.' Ex. A at 38.) While Dr. Geraci determined that a wheelchair was not necessary, Plaintiff was issued a walker that same day. (Defs.' Ex. A at 116.) Plaintiff's position that Dr. Geraci should have requested an MRI based on his prior history of back pain and/or acute injury constitutes a disagreement over treatment, not a constitutional violation.

The Court is mindful of Plaintiff's allegation that Dr. Geraci stated that he "[does not] like to order MRIs all willy nilly because they are expensive." (Sec. Am. Compl. at 19.) While the allegation that a medical professional made a medical decision based on monetary incentives can demonstrate a culpable state of mind, Chance, 143 F.3d at 704, here, the record does not indicate that an MRI was medically required. See Shepherd v. Powers,

---

[4] Toradol, a brand name for the drug Ketorolac, is a type of NSAID that "is used for the short-term relief of moderately severe pain[.]" Ketorolac, MEDLINE PLUS, https://www.nlm.nih.gov/medlineplus/druginfo/meds/a693001.html (last visited January 23, 2017).

No. 11-CV-6860, 2012 WL 4477241, at *6 (S.D.N.Y. Sept. 27, 2012)

(dismissing the plaintiff's deliberate indifference claim where he

alleged that he was denied an MRI based on expense but failed to

plead "any facts in support of his claim that treatment by a

specialist or an M.R.I. was medically necessary"). Moreover, the

notion that Dr. Geraci did not order an MRI in June 2014 based on

financial concerns is undercut by the fact that in 2016, Dr. Geraci

requested an MRI, referred Plaintiff for a neurosurgeon

consultation, and approved Plaintiff for physical therapy.

(Defs.' Ex. G, Docket Entry, 127-13, at 41-43, 127-28.)

      Similarly, Dr. Geraci's decision to request an MRI of

Plaintiff's lower back, rather than his entire back, relates to a

medical judgment and does not establish that he failed to provide

adequate medical care. Dr. Geraci saw Plaintiff and noted that

his complaints of low back pain did not correlate with his physical

abilities; nevertheless, he prescribed Robaxin and Tylenol and

requested an MRI of the lower spine to rule out stenosis. (Defs.'

Ex. G at 25-26, 34.) Again, Dr. Geraci's determination that an

MRI of the entire spine was not appropriate constitutes a medical

judgment, not a constitutional violation.

      Conversely, the Court finds that Plaintiff has raised

triable issues of fact regarding Dr. Geraci's alleged failure to

provide medical treatment between June or July 2014 and April 2016.

When Plaintiff ultimately received an MRI of his lower back in

June 2016, it revealed spinal lipomatosis in the lumbar region.[5]
(Defs.' Ex. G at 34, 129.)  Thereafter, Plaintiff consulted with
a neurosurgeon, who recommended physical therapy.  (Defs.' Ex. G
at 128.)  Plaintiff's allegations of chronic pain combined with
his positive diagnosis of spinal lipomatosis raises issues of fact
as to whether he was suffered an objectively serious deprivation
of adequate medical care.  See Goodwin, 2015 WL 1040663, at *11
(noting that the "existence of chronic and substantial pain" is a
factor in evaluating the seriousness of the plaintiff's medical
need) (internal quotation marks and citations omitted).

Defendants argue that during 2014 through 2016,
Plaintiff failed to complain of any back pain during his mental
health evaluations and observation reports indicated that "he had
no problem ambulating about his cell area or going to the yard."
(Defs.' Br. at 10-11.)  The Court is mindful both that "the fact
that no reasonable doctor perceived [p]laintiff's [injury] as
important and worthy of comment or treatment weighs against a
finding that this injury was sufficiently serious," Goodwin, 2015
WL 1040663, at *13 (internal quotation marks and citation omitted),
and that Dr. Geraci has asserted that "[i]n [his] experience at

_____

[5] "Spinal epidural lipomatosis consists of the overgrowth of
epidural adipose tissue in the spinal canal causing spinal cord
or nerve root compression."  Skubisz v. Colvin, No. 12-C-10320,
2014 WL 4783851, at *3 n.7 (N.D. Ill. Sept. 24, 2014) (internal
quotation marks and citation omitted).

the jail, if an inmate expresses any acute distress regarding a physical ailment to the mental health unit, it will be noted in the record and the inmate will be referred to the medical unit," (Geraci Aff., Defs. Ex. H, Docket Entry 127-14, ¶ 22.) However, Plaintiff alleges that he "asked mental health for a MRI and pain med[ication]. They said that is up to Dr. Geraci," and that his mental health evaluations lasted "less than 60 seconds." (Pl.'s Suppl. 56.1 Counterstmt. ¶ 48.) Moreover, while the relevant observation reports state that Plaintiff went to recreation, visits, and the law library, (see generally Defs.' Exs. C-1 and C-2, Docket Entries 127-8, 127-9), Plaintiff asserts that he has been on twenty-three hour lock down since September 2013 and he typically walks three steps to a chair and five steps to a shower. (Pl.'s 56.1 Counterstmt. ¶ 14.)

Additionally, Plaintiff has raised issues of fact as to whether Dr. Geraci acted with a sufficiently culpable state of mind. As previously noted, Plaintiff alleges that he filed numerous medical chits during 2014 through 2016 that were summarily ignored. (See Pl.'s Suppl. 56.1 Counterstmt. ¶ 50 ("my complaints of pain went unanswered from 7-18-14 to 4-22-2016").) While there is no documentary evidence regarding these alleged chits, it is undisputed that on November 15, 2015, Plaintiff wrote a note to Dr. Geraci alleging that Dr. Geraci failed to order an MRI due to cost concerns and requesting that Dr. Geraci order an MRI,

orthopedic sneakers, and physical therapy, (Defs.' Ex. G at 10.) Plaintiff also filed a grievance in January 2016 alleging that he was denied an MRI based on cost, which was forwarded to the SCCF medical unit in February 2016. (Defs.' Suppl. 56.1 Stmt. ¶ 49.) Nevertheless, Plaintiff was not seen by Dr. Geraci--or any other member of the medical unit--until April 22, 2016. (See Defs.' Ex. G at 25.)

Defendants argue that Plaintiff's November 2015 note "did not indicate that the [P]laintiff was in any acute distress but was rather a repeat of his prior complaints," and Dr. Geraci intended to meet with Plaintiff to "explain[ ] the treatment the [P]laintiff was receiving." (Defs.' Br. at 12.) Plaintiff's note is not included in the record. While Dr. Geraci's medical notes reflect that Plaintiff did not expressly state that he was suffering from back pain, a reasonable juror could conclude that Plaintiff's request for an MRI, orthopedic sneakers, and physical therapy, sufficed to make Dr. Geraci aware that Plaintiff was continuing to complain of back pain. (See Defs.' Ex. G at 11-12.) Indeed, Dr. Geraci's medical note dated November 6, 2015, indicates that he intended to see Plaintiff the following week, (Defs.' Ex. G at 25); however, as noted, Dr. Geraci did not see Plaintiff until approximately five months later. Thus, a reasonable juror could conclude that Dr. Geraci knew of and disregarded an excessive risk to Plaintiff's safety.

Accordingly, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's claims regarding Dr. Geraci's refusal to request an MRI in June 2014 and an MRI of Plaintiff's entire back in April 2016 and DENIED with respect to Plaintiff's claim regarding Dr. Geraci's failure to provide medical treatment between June 2014 and April 2016.

B.   Nurse Webster

The Second Amended Complaint alleges that Nurse Webster refused to provide Plaintiff with a wheelchair on February 11, 2015. (Sec. Am. Compl. at 27-28.) Putting aside the question of whether Plaintiff suffered an objectively serious deprivation, Plaintiff has not demonstrated that Nurse Webster knew of and disregarded an excessive risk to his health. Medical records indicate that on February 11, 2015, Plaintiff complained to correction officers that he was unable to walk through the jail tunnel to court; however, these records also indicate that Plaintiff was observed ambulating without assistance or difficulty. (Defs.' Ex. A at 48.) Additionally, Plaintiff does not dispute that he no longer needed a walker when it was discontinued in July 2014. (Pl.'s 56.1 Counterstmt. ¶ 13; Defs.' 56.1 Stmt. ¶ 13.) Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claim against Nurse Webster in the absence of any evidence that she was aware of "facts from which the inference could be drawn that a substantial risk of harm

existed, and also drew the inference." Black, 2016 WL 3983590, at *3 (internal quotation marks and citations omitted).

C. Warden Ewald

The Court construes Plaintiff's claim against Warden Ewald as a supervisory liability claim. (See Sec. Am. Compl. at 24; Pl.'s Suppl. 56.1 Counterstmt. ¶ 68 ("I am in [Warden Ewald's] custody. I sent him a certified letter requesting that he steps in").) Defendants argue that Plaintiff has failed to demonstrate Warden Ewald's direct participation in constitutional violations. (Defs.' Reply Br., Docket Entry 133, at 7.) The Court agrees.

The plaintiff must demonstrate that the defendant was personally involved in constitutional violations to establish supervisory liability pursuant to Section 1983. Melvin v. Cty. of Westchester, No. 14-CV-2995, 2016 WL 1254394, at *17 (S.D.N.Y. Mar. 29, 2016). However, a supervisory official may be liable for a constitutional violation if he "participated directly in the alleged constitutional violation" or "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).[6]

---

[6] The question of whether the three additional bases for supervisory liability set forth in Colon have survived the Supreme Court's decision in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009), has "engendered conflict" within the Second Circuit. Stancati v. Cty. of Nassau, No. 14-CV-2694, 2015 WL 1529859, at *3 n.4 (E.D.N.Y. Mar. 31, 2015).

The Second Amended Complaint's sole allegation regarding Warden Ewald is that in September 2014, Plaintiff's father sent Warden Ewald a letter requesting that he "intervene."[7] (Sec. Am. Compl. at 24; see also Pl.'s Suppl. 56.1 Counterstmt. ¶ 68 (alleging that Plaintiff is in Warden Ewald's "custody" and Plaintiff "sent him a certified letter requesting that he step[ ] in").) While district courts in this Circuit have reached different results as to whether a prison official's receipt of a grievance letter demonstrates personal involvement, here, Plaintiff's bare allegation that his father sent Warden Ewald a vague request to "step[ ] in" does not suffice. Donohue v. Manetti, No. 15-CV-0636, 2016 WL 740439, at *4 (E.D.N.Y. Feb. 24, 2016) (collecting cases). See e.g., McFadden v. Friedman, No. 12-CV-0685, 2015 WL 5603433, at *19 (N.D.N.Y. Sept. 23, 2015) ("where an inmate alleges that he sent a letter to a prison official, and the prison official failed to investigate allegations of staff

_____

See also Iqbal, 556 U.S. at 676, 129 S. Ct. at 1948 ("[b]ecause vicarious liability is inapplicable . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution"). This Court previously held that "only personal involvement and a custom or practice survive as viable bases for supervisory liability." Stancati, 2015 WL 1529859, at *3, n.4. In the absence of additional guidance from the Supreme Court or Second Circuit, this Court sees no reason to deviate from its prior holding.

[7] It is unclear whether this letter was authored by Plaintiff or his father.

misconduct, the inmate must show more than merely reciting the fact that they sent a letter"). Thus, Plaintiff has failed to establish Warden Ewald's direct participation in any constitutional violations.

Parenthetically, while Plaintiff alleges the existence of a municipal policy, he has not alleged that Warden Ewald created or permitted the continuance of any custom or policy that resulted in constitutional violations. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's claims against Warden Ewald.

   D.   <u>Deputy Sheriffs Shapiro and Mehrman</u>

Plaintiff's claim against Deputy Sheriffs Shapiro and Mehrman is based on their alleged refusal to permit him to see an Orthopedist at Peconic Bay Medical Center ("Peconic Bay"). (Sec. Am. Compl. at 15-16, 37.) However, Plaintiff has not demonstrated that a referral to see an Orthopedist was medically necessary. Hospital records indicate that an x-ray of Plaintiff's back was performed, and he was examined by a physician and diagnosed with a back contusion.[8] (Defs.' Ex. A at 64-65.) Plaintiff was administered Percocet and Torodol and prescribed Ibuprofen. (Defs.' Ex. A at 66, 68-69.) Notably, the Peconic Bay medical

---

[8] Plaintiff's discharge instructions indicate that a back contusion is a "bruise with swelling and some bleeding under the skin. There are no broken bones. This injury takes a few days to a few weeks to heal." (Defs.' Ex. A at 67.)

records do not reference any referral to an Orthopedist, nor do they indicate that examination by an Orthopedist was medically necessary. Cf. Ventura v. Sinha, 379 F. App'x 1, 2 (2d Cir. 2010) (affirming summary judgment on the deliberate indifference claim regarding the defendant's failure to provide a referral to an orthopedist where the medical examination did not reveal any injuries, diagnostic tests and X-rays did not reveal remarkable results, and the plaintiff "responded positively" to the prescribed treatment).

Moreover, Peconic Bay records indicate that the emergency room physician determined that Plaintiff should be discharged. (Defs.' Ex. A at 65 (circling "discharge" next to disposition).) Plaintiff has failed to raise any triable issues as to whether he suffered an objectively serious deprivation of medical care in the absence of any evidence that an orthopedic consultation was medically necessary. Accordingly, summary judgment is GRANTED as to Plaintiff's claims against Deputy Sheriffs Shapiro and Mehrman.

E. Officer Koch

Plaintiff's claims against Officer Koch are based on two sets of allegations: (1) On June 25, 2014, Plaintiff told Officer Koch that he "felt extreme chest pains" and Officer Koch refused to request medical care, and (2) Officer Koch made a series of verbally abusive and/or threatening statements.

"[C]hest pains alone generally do not constitute a sufficiently serious medical condition for purposes of a deliberate indifference claim." Melvin, 2016 WL 1254394, at *5. Plaintiff has not alleged that he advised Officer Koch that he was experiencing additional symptoms and, indeed, appears to assert that his chest pains were the result of heartburn. (Pl.'s 56.1 Counterstmt. ¶ 20.) Thus, Plaintiff has failed to demonstrate that Officer Koch disregarded an objectively serious medical issue.

With respect to Officer Koch's alleged verbal harassment, even if the Court liberally construes the Second Amended Complaint as asserting a claim for First Amendment retaliation against Officer Koch, that claim fails. (See Sec. Am. Compl. at 26 ("I put in a grievance on [Officer Koch] the week prior. So he was seeking revenge").)

To establish a claim for retaliation in contravention of the First Amendment, the plaintiff must demonstrate "(1) protected speech or conduct, (2) adverse action by defendant, and (3) a causal connection between the protected speech and the adverse action." Bilal v. White, 494 F. App'x 143, 146 (2d Cir. 2012). Putting aside Defendants' argument regarding exhaustion, the parties do not dispute that Plaintiff filed a grievance against Officer Koch, (Defs.' 56.1 Stmt. ¶ 35); thus, Plaintiff engaged in protected activity. Even assuming, arguendo, that Officer Koch's

alleged threats and verbal abuse constitute adverse action, the record does not establish a causal connection between those statements and Plaintiff's protected activity. Officer Koch's alleged statements--while reprehensible--do not reference Plaintiff's grievance or otherwise indicate that his threats relate to Plaintiff's grievance. (See Sec. Am. Compl. at 25, 34-36.) Plaintiff's assertion that Officer Koch was "seeking revenge" for his grievance does not suffice to establish such a connection. Accordingly, Defendants' motion for summary judgment is GRANTED as to Plaintiff's Section 1983 claims against Officer Koch.

F.    The County

Pursuant to Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 694, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978), a municipality is not subject to Section 1983 liability on a theory of respondeat superior. Melvin, 2016 WL 1254394, at *11. Municipal liability only attaches where "'action pursuant to official municipal policy of some nature caused a constitutional tort.'" Id. (quoting Monell, 436 U.S. at 691).

One means of establishing the existence of a municipal policy or custom is to allege "a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware." Donohue, 2016 WL 740439, at *5 (internal quotation marks and citation omitted). To succeed on this theory, the plaintiff

must demonstrate that the alleged municipal policy is "permanent and well-settled." Id. However, "[n]ormally, a single incidence of unconstitutional conduct is insufficient to establish municipal liability, unless there is proof that the incident was caused by an existing, unconstitutional municipal policy that can be attributed to the municipal policymaker." Hensel v. City of Utica, No. 15-CV-0374, 2016 WL 1069673, at *10 (N.D.N.Y. Mar. 16, 2016).

Plaintiff cites a federal lawsuit in which the plaintiff alleged that SCCF provides "shoddy" care, fails to treat serious injuries, and "medical staff 'alter' inmates' medical records and it[']s a common practice." (Pl.'s 56.1 Counterstmt. ¶ 41.) In support, Plaintiff annexes a copy of the Memorandum and Order determining the defendants' motion for summary judgment in Dillon v. Suffolk Cty. Dep't of Health Servs., 917 F. Supp. 2d 196 (E.D.N.Y. 2013) (the "Dillon Action"), and a newspaper article regarding the trial in that matter. (Pl.'s Ex. 4, Docket Entry 131-4, at 6-22.)

Putting aside potential hearsay issues, (see Defs.' Reply Br. at 9), the Court finds that the existence of the Dillon Lawsuit does not establish a municipal custom or policy. The Dillon Action was filed by a former SCCF physician who asserted a First Amendment retaliation claim and a New York State whistleblower statute claim against the County, Dr. Geraci, and the County Commissioner of Health Services regarding events that

took place during 2007 and 2008. See generally Dillon, 917 F. Supp. 2d at 200-203. First, the allegations in the Dillon Action--which were asserted in the context of a federal lawsuit and disputed by the defendants in that matter--do not establish that SCCF's alleged inadequate medical treatment is a "consistent and widespread" practice. Second, the allegations set forth in the Dillon Action relate to purported incidents that occurred during 2007 and 2008 and, thus, predate both Plaintiff's admission to SCCF in 2013 and the alleged inadequate medical treatment that took place from 2013 onward. Accordingly, Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's Monell claim against the County.

G.   Qualified Immunity

A government official named as a defendant in his individual capacity is entitled to qualified immunity where: (1) federal law does not prohibit the defendant's conduct; or (2) if the defendant's conduct was prohibited, "the plaintiff's right not to be subjected to such conduct by the defendant was not clearly established at the time it occurred"; or (3) the defendant's conduct was objectively legally reasonable based on the clearly established law at the time the actions were taken. Manganiello v. City of N.Y., 612 F.3d 149, 164 (2d Cir. 2010) (citations omitted). The party seeking the application of qualified immunity bears the burden of establishing that "it was

34

objectively reasonable for [him] to believe that [his] actions did not violate a clearly established right and that [he] is entitled to qualified immunity." Vasquez-Mentado v. Buitron, 995 F. Supp. 2d 93, 102-103 (N.D.N.Y. Jan. 29, 2014).

Defendants argue that Dr. Geraci is entitled to qualified immunity and aver that his conduct did not violate clearly established law and was not objectively unreasonable. (Defs.' Br. at 19-20.) However, to the extent the previously noted disputes of fact regarding Plaintiff's deliberate indifference claim are resolved in his favor, Dr. Geraci would not be entitled to the defense of qualified immunity, as it was objectively unreasonable for Dr. Geraci to believe that his failure to provide any medical treatment regarding Plaintiff's back pain for nearly two years was reasonable. See Soto v. Rezkella, No. 04-CV-1126, 2007 WL 2161791, at *3 (S.D.N.Y. Jul. 26, 2007) ("[a] prisoner's constitutional right under the Eighth Amendment to be free from deliberate indifference to their serious medical need is clearly established, and would be well known by any reasonable prison doctor"). The Court need not determine whether Dr. Geraci's individual co-defendants are entitled to qualified immunity in light of its dismissal of Plaintiff's Section 1983 claims against them.

II.  <u>State Law Claim</u>

The history of Plaintiff's amendments to the Complaint is relevant to the Court's determination of the nature of his state law claims.  Briefly, on April 16, 2015, Plaintiff filed a motion seeking to amend the complaint to "add a supplemental jurisdiction state medical negligence claim under 28 U.S.C. Section 1367[, and] another for emotional distress and psychological torture against Officer Robert Bob Koch."  (Pl.'s Apr. 2015 Mot., Docket Entry 23 at 1.)  On May 11, 2015, Judge Lindsay issued an Electronic Order granting Plaintiff's unopposed application.

On September 16, 2015, Plaintiff filed a motion to amend the Amended Complaint and sought to add, _inter alia_, a claim of "medical negligence" against all Defendants and "intentional infliction of emotional distress, harassment and sexual harassment" against Officer Koch.  (Pl.s Sept. 2015 Mot., Docket Entry 60.)  On May 5, 2016, Judge Lindsay determined Plaintiff's motion and denied Plaintiff leave to assert his proposed claim for medical negligence.  (May 2016 Order, Docket Entry 114, at 6-7.)

Accordingly, the Court construes the Second Amended Complaint as asserting a claim for intentional infliction of emotional distress against Officer Koch.[9]  While Plaintiff

---

[9] The Court acknowledges that Plaintiff attempted to assert a claim for medical negligence in his first Amended Complaint. (_See_ Pl.'s Apr. 2015 Mot. at 1.)  However, it is well-established that an amended complaint ordinarily supersedes the

referenced sexual harassment in his September 2015 motion to amend, (see Pl.'s Sept. 2015 Mot. at 2), the Second Amended Complaint is bereft of any factual allegations that could arguably be considered sexual harassment, and does not even contain the phrase "sexual harassment."

To state a claim for intentional infliction of emotional distress under New York state law, the plaintiff must demonstrate: "(1) extreme and outrageous conduct; (2) intent to cause, or reckless disregard of a substantial probability of causing, severe emotional distress; (3) a causal connection between the conduct and the injury; and (4) severe emotional distress." Perri v. Bloomberg, No. 06-CV-0403, 2007 WL 2891332, at *9 (E.D.N.Y. Sept. 28, 2007) (internal quotation marks and citations omitted). Courts are "exceedingly strict" in determining intentional infliction of emotional distress claims and liability is limited to cases "where conduct is so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a

---

original and renders it of no legal effect. Cf. Ping Tou Bian v. Taylor, 23 F. App'x 75, 77 (2d Cir. 2001) (internal quotation marks and citations omitted). Plaintiff requested leave to assert a medical negligence claim in his Second Amended Complaint and that request was denied by Judge Lindsay in her Order dated May 5, 2016. (May 2015 Order at 6-7.) Thus, the Second Amended Complaint--which does not contain a medical negligence claim pursuant to Judge Lindsay's May 2016 Order-- controls.

civilized community." <u>King v. City of N.Y.</u>, No. 12-CV-2344, 2013 WL 2285197, at *11 (E.D.N.Y. May 23, 2013) (internal quotation marks and citation omitted). The plaintiff's ability to recover for "purely emotional harm" is "extremely limited and, thus, a cause of action seeking such recovery must generally be premised upon a breach of a duty owed directly to the plaintiff which either endangered the plaintiff's physical safety or caused the plaintiff fear for his or her own physical safety." <u>Id.</u> (internal quotation marks and citation omitted).

Here, Plaintiff alleges that Officer Koch, <u>inter alia</u>, told him that he wanted to "execute [him] with his pistol," (Sec. Am. Compl. at 25), and wrote down the addresses of Plaintiff's loved ones and stated "you can't protect them from here," (Sec. Am. Compl. at 25, 34). Additionally, Plaintiff alleges that between September 2013 and June 2014, Officer Koch "berated [him] daily," and stated that: (1) "he would love to volunteer for [Plaintiff's] firing squad," (2) "he [wa]s going to bring in his pistol and shoot [Plaintiff] in [his] head if his condition worsens," and (3) "in Texas, they would have executed [you] already." (Sec. Am. Compl. at 34.) Plaintiff avers that Officer Koch was aware that gangs had a "hit" on his life and stated that "gang members [we]re going to have [Plaintiff] on [his] knees sucking dick all day . . . [and] they [we]re going to make [Plaintiff] their bitch." (Sec. Am. Compl. at 35.) Further,

Plaintiff alleges that Officer Koch told him that he "should hang [him]self after 3AM." (Sec. Am. Compl. at 36.) Plaintiff avers that as a result of this and other conduct, he has suffered from nightmares and emotional distress. (Sec. Am. Compl. at 36.)

Defendants have not posited any arguments regarding the substance of Plaintiff's state law claim and instead aver that the Court should decline to exercise supplemental jurisdiction in the absence of viable federal claims. (Defs.' Br. at 23-24.) Additionally, Defendants urge the Court to dismiss Plaintiff's state law claim for reasons consistent with their arguments regarding Plaintiff's federal claims. (Defs.' Br. at 23-24.)

The Court finds that issues of fact preclude summary judgment on Plaintiff's intentional infliction of emotional distress claim, as a reasonable juror could conclude that Officer Koch's conduct was sufficiently "extreme and outrageous." While "mere insults, indignities, and annoyances," do not constitute intentional infliction of emotional distress, "New York courts appear to require that plaintiffs allege either an unrelenting campaign of day in, day out harassment or that the harassment was accompanied by physical threats, in order to state a cognizable claim[.]" Nunez v. A-T Fin. Info. Inc., 957 F. Supp. 438, 442 (S.D.N.Y. 1997) (internal quotation marks and citation omitted). Cf. Rother v. NYS Dep't of Corr. and Cmty. Supervision, 970 F. Supp. 2d 78, 104-105 (N.D.N.Y. 2013) (dismissing the plaintiff's

intentional infliction of emotional distress claim where "[the defendant's] tirade, although highly offensive misogynist, and demeaning, was a one-time occurrence unaccompanied by physical contact or the threat thereof; likewise, the vandalism, shunning, and threats of tire slashing, however disconcerting, did not involve actual or threatened physical contact or implicate immediate bodily harm").

As set forth above, Plaintiff has alleged that he was berated on a daily basis, Officer Koch threatened to kill him, and he suffered nightmares and emotional distress as a result of Officer Koch's conduct. Moreover, Defendants have failed to proffer any evidence refuting Plaintiff's claims. Parenthetically, while New York courts "routinely" award summary judgment based on the plaintiff's failure to support an intentional infliction of emotional distress claim with medical evidence, Biberaj v. Pritchard Industries, Inc., 859 F. Supp. 2d 549, 565 (S.D.N.Y. 2012), in light of Plaintiff's claim that Dr. Geraci ignored his requests for medical care and many of the grievances he filed regarding Officer Koch's conduct were "lost," (Sec. Am. Compl. at 36), the Court finds that an award of summary judgment based on Plaintiff's failure to submit medical evidence is not appropriate at this juncture.

Accordingly, Defendants' motion for summary judgment is DENIED as to Plaintiff's intentional infliction of emotional distress claim against Officer Koch.

CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment (Docket Entry 127) is GRANTED IN PART and DENIED IN PART. Defendants' motion for summary judgment is GRANTED with respect to Plaintiff's Section 1983 claims against Nurse Webster, Warden Ewald, Deputy Sheriff Shapiro, Deputy Sheriff Mehrman, Officer Koch, and the County, as well as his claim against Dr. Geraci for failing to request an MRI in 2014 and refusing to request an MRI of Plaintiff's entire back in 2016. Defendants' motion for summary judgment is DENIED with respect to: (1) Plaintiff's 1983 claim against Dr. Geraci for failing to provide medical treatment between June 2014 and April 2016, and (2) Plaintiff's state law claim against Officer Koch for intentional infliction of emotional distress. The Clerk of the Court is directed to TERMINATE Nurse Webster, Warden Ewald, Deputy Sheriff Shapiro, Deputy Sheriff Mehrman, and the County as defendants in this action. The Clerk of the Court is further directed to mail a copy of this Memorandum and Order to the pro se Plaintiff.

Given Plaintiff's pro se status, the Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this

Memorandum and Order would not be taken in good faith and therefore

in forma pauperis status is DENIED for purposes of an appeal.

Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8

L. Ed. 2d 21 (1962).


                                        SO ORDERED.

                                        /s/ JOANNA SEYBERT
                                        Joanna Seybert, U.S.D.J.

Dated:      January  31  , 2017
            Central Islip, New York